ORIGINAL

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>HENDRA ANWAR and ASTATI HALIM | 13-2472M |
| | MAGISTRATE'S CASE NO. |

FILED
CLERK, U.S. DISTRICT COURT

SEP - 9 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Complaint for violation of Title 18, United States Code, Section 1324 (a)(1)(A)(i)(i)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE PATRICK J. WALSH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>December 31, 2012 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>136 North Rossmore Avenue, Los Angeles, California |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

8 U.S.C. § 1324(a)(1)(A)(iii)

On or about December 31, 2012, in Los Angeles County, defendants HENDRA ANWAR and ASTATI HALIM, knowing and in reckless disregard of the fact that an alien had come to, entered, and remained in the United States in violation of law, concealed, harbored, and shielded from detection, and attempted to conceal, harbor, and shield from detection, such alien in any place, including any building and any means of transportation.

LODGED

2013 SEP -9 PM 2:38
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DAVID LAM** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>September 9, 2013 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA M. Blanco x 2253   REC: Detention

## Affidavit of David Lam

I, David Lam, being duly sworn, do hereby depose and say:

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"). I have been employed as a SA with the FBI since August of 2009. Currently, I am assigned to the Los Angeles Field Office, Civil Rights Squad. In that capacity, I am responsible for investigating the trafficking of people into the United States.

2.    The information contained in this affidavit is the result of my own personal investigation, information communicated to me by other law enforcement officers familiar with these facts, statements from witnesses, training and experience, and my review of recorded conversations. Unless specifically indicated otherwise, all conversations, statements and other information described in this affidavit are related in substance and in part only.

### PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of an application for a criminal complaint and arrest warrants for violations of Title 8, United States Code, Section 1324 (a)(1)(A)(iii), (Alien Harboring) for the following individuals:

1

a.   ASTATI HALIM ("HALIM").  HALIM is an Indonesian national who has had Lawful Permanent Resident ("LPR") status in the United States since September 12, 1977.  Government records, including immigration documents, indicate that HALIM is married to HENDRA ANWAR.  The investigation has revealed that HALIM resides at the SUBJECT PREMISES (defined below), where she and HENDRA ANWAR employ a number of Indonesian domestic employees.

b.   HENDRA ANWAR ("ANWAR").  Government records, including immigration documents, indicate that ANWAR is married to HALIM.  The investigation has revealed that ANWAR works in Hong Kong and resides in the United States, where his family lives, part-time.  When he is in the United States, ANWAR resides at the SUBJECT PREMISES, where he and HALIM employ a number of Indonesian domestic employees.

4.   This affidavit is also made in support of an application for a warrant to search one single family residence for evidence of violations of Title 8, United States Code Section 1324 (Alien Harboring); and Title 18, United Stated Code, Sections 371 (Conspiracy) and 1546 (Visa Fraud), as described more fully in Attachment B.

5.    This affidavit is intended to show there is sufficient probable cause for the requested search warrant, arrest warrants, and criminal complaint, and does not purport to set forth all the facts known to me concerning this investigation.

6.    The premises to be searched (the "SUBJECT PREMISES") is as follows:  136 North Rossmore Avenue, Los Angeles, California.  The SUBJECT PREMISES is a single-family, two-story home that is located on the east side of North Rossmore Avenue. The SUBJECT PREMISES is clearly marked with the number "136 N," which is written in black and located on the curb directly in front of the residence, to the right of the driveway.  The building is cream-colored stucco and brick, with a brown shingle roof.  The driveway is located on the north side of the residence.  The garage, which is not attached to the home, is located in the rear of the residence.  A separate detached structure, containing a bedroom and bathroom used as a guest house, and a swimming pool are located in the rear of The SUBJECT PREMISES.

### ITEMS TO BE SEIZED

7.    I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities that

constitute evidence of violations of Title 8, United States Code, Section 1324 (Alien Harboring); and Title 18, United States Code, Sections 371 (Conspiracy) and 1546 (Visa Fraud).

## BACKGROUND ON HUMAN TRAFFICKING

8.   I have participated in several human trafficking and alien harboring investigations.  In addition, I have consulted with senior agents and law enforcement officers who have participated in dozens of human trafficking and alien harboring investigations and trials.  I have also attended workshops and training sessions on human trafficking.  Based on my training and experience as a Special Agent with the FBI, and on my consultation with more senior agents and officers, I am aware that human trafficking and alien harboring operations typically operate as follows:

a.   Victims are smuggled into the U.S. for purposes of involuntary servitude.  These victims are smuggled by "traffickers" who reside in and outside the U.S.  For the purposes of this affidavit, the term "trafficker" includes, but is not limited to, alien smugglers, individuals who harbor illegal aliens, human traffickers and any of their agents, brokers, and/or employees.

4

b.   These victims are initially lured into the U.S. by false promises of favorable job conditions and relatively high wages.  The victims do not have the money required to travel into the U.S. so they agree to be smuggled into the U.S. for a fee.  The traffickers use a network of co-conspirators to arrange for the international transport of these victims, often times through the procurement of fraudulent visas.

c.   A common practice smugglers utilize to assist victims in securing visas to travel to the U.S. is the submission of fraudulent documentation to U.S. Embassies.

d.   In addition to submitting false paperwork in support of the visa application, smugglers will also coach victims for embassy interviews by providing a set list of questions and responses the victim should be prepared to answer during the interview process.  Once the fraudulent visas are obtained, victims travel from their home country to the U.S. where they are delivered to their traffickers.

e.   After the victims arrive in the U.S. the traffickers instruct them to work extremely long hours with very few breaks or days off.  The traffickers will often house the victims at their residences in order to keep a close watch over them.

f.    Traffickers also often create a climate of fear in order to coerce their victims to continue to work and to help the traffickers avoid detection from law enforcement.  Tactics to that end include instilling fear of law enforcement and especially immigration authorities, isolating victims from sources of aid by insisting that outsiders will report illegal aliens to law enforcement, and engendering mutual mistrust among the victims.  These threats are typically unrelated to a good faith effort to report illegal activities, as evidenced by the fact the traffickers' only report or threaten to report their victims if they refuse to work.

g.    Traffickers also usually maintain records of trafficking and/or harboring debts that are often recorded in books, notes, ledgers, pay/owe sheets, and IOUs.  They also typically maintain large sums of cash, bank account records and records of money wires (international and domestic).  Often such documentary evidence is written in a coded manner to hide the illegal activity, and the traffickers often maintain these records in the form of hand-written notes.  The funds often are or contain the proceeds of the trafficking activity including, but not limited to, debt payments.  Traffickers often keep these records for an extended period of time.  Traffickers are also

known to maintain travel itineraries that relate to illegal activities including records of trips taken to recruit and obtain victims and to transport funds and documents to various locations.

h. It is routine for traffickers to hide information regarding their illegal activity in secure locations within their homes, apartments, businesses, storage facilities, safe deposit boxes and vehicles. The documents mentioned in the aforementioned paragraph are commonly maintained in these locations. These records are routinely maintained for extended periods. This is especially true when employment relationships related to illegal trafficking activities extend over a long period of time.

i. Traffickers routinely maintain assets associated with their criminal activity such as vehicles, mobile telephones, bank accounts and real estate holdings under fictitious names or under the names of other persons (nominee subscribers) such as relatives and/or associates to avoid detection by law enforcement. Despite the use of fictitious names, traffickers maintain control over these hidden assets. Additionally, traffickers often make travel arrangements under

7

fictitious names or under the names of other persons, as described above, to avoid detection by law enforcement.

j.    Traffickers maintain address and/or telephone books listing names and/or clients of those involved in their criminal activity.  Often these names, addresses or telephone numbers will be in code.

k.    Traffickers, like many people, frequently take, or cause to be taken, photographs of their residences, their property, and their victims that they smuggle.  Traffickers maintain these photographs in their homes, businesses, storage lockers, safety deposit boxes and automobiles.  These photographs will often show traffickers and the trafficked victims together.

l.    Traffickers are known to use mobile telephones and personal data assistants to communicate with their co-conspirators.  These communication devices have memory storage capabilities, including the storage of return telephone numbers and addresses which often belong to co-conspirators involved in the human trafficking, harboring, importation, and transportation of aliens.

m.    As a matter of routine, traffickers maintain documents and/or indicia, which is evidence of their occupancy

8

or ownership of their residential and/or business premises. The documents and indicia are commonly found on their person and in their residence. Such documents include, but are not limited to nominee banking records, foreign bank records, utility bills, rent receipts, pager/mobile telephone receipts, rental/lease agreements, payment receipts, personal mail and other correspondence addressed to persons at the residence.

n.   Traffickers often maintain custody of documents belonging to the victims, including identification documents, passports and other travel-related documentation to prevent the victims from leaving on their own initiative. These documents are typically held in homes, businesses and/or safety deposit boxes.

o.   The trafficking victims often maintain personal letters and handwritten notes at the locations where they live and work, which are indicia of where they reside and what activities they are engaged in and with whom. For example, some trafficking victims maintain their own records of debt payments, so that they can reconcile them with their trafficker's records.

p.   Traffickers often maintain items associated with their business off-site so the items will not be discovered during a raid by law enforcement or inspection by regulatory

officials. Such items include, but are not limited to, pay/owe sheets, laundry receipts, toiletries, tally sheets, bills and cancelled checks paid to other persons.

## STATEMENT OF PROBABLE CAUSE

9. On or about February 14, 2013, the Coalition Against Slavery and Trafficking ("CAST") contacted the FBI and reported that an individual ("V1") was the victim of human trafficking. FBI SAs David Lam and Tamara McKen, along with Los Angeles Police Department ("LAPD") Detective Steve Koman, interviewed V1 on or about February 15, 2013. During the course of that interview, and during subsequent interviews, V1 provided the following information:

a. In or around January 2010, V1 was recruited in his/her home country of Indonesia by HALIM's sister to care for their father in the United States. V1 learned about the job opportunity from a former co-worker who had previously worked for HALIM's sister. HALIM's sister informed V1 that s/he was to be paid approximately $2 million to $2.5 million Rupiah (approximately $200 to $250 USD) per month.

b. According to V1, HALIM's nephew assisted V1 in procuring a visa to travel to the United States. According to V1, HALIM's nephew instructed V1 to misrepresent the nature of

10

their relationship and the purpose of V1's trip to embassy officials. Specifically, V1 indicated that s/he was instructed to tell embassy officials that: (1) V1 was an employee of HALIM's nephew and his wife, (2) V1 had been employed as their babysitter for five years, and (3) V1 was traveling to the United States in order to provide child-care services for their child.

c. V1 believed that HALIM's sister, HALIM's nephew, and HALIM arranged and paid to have all the necessary documents and paperwork completed in order for V1 to travel to the United States.

d. Based on conversations with HALIM's sister, V1 believed s/he was being hired to work in the United States for a term of two years. Approximately two days prior to departing for the United States, however, V1 was given a work contract for five years. V1 indicated that s/he felt obligated to sign the five year contract because his/her travel expenses had already been paid for.

e. On or about January 10, 2011, V1 flew to the Los Angeles International Airport ("LAX") with HALIM's nephew, his wife, and their minor child. V1 indicated that s/he was given his/her passport at customs, but that s/he returned the passport

11

to the wife of HALIM's nephew as soon as s/he was admitted into the United States.  V1 has not had possession of his/her passport since then.

f.   HALIM met her nephew, his family, and V1 at LAX and transported them to the SUBJECT PREMISES, where V1 immediately began working.  When V1 arrived at the SUBJECT PREMISES, domestic employees were already working for HALIM and ANWAR.

g.   V1 claimed that s/he and the other domestic employees were required to work at the SUBJECT PREMISES approximately fourteen hours per day, seven days per week, doing such things as:  cleaning the SUBJECT PREMISES; cooking meals for HALIM, ANWAR, and their children; washing cars that HALIM, ANWAR, and their family would drive; and performing yard work. On occasion, when V1 and the other the domestic employees completed their assigned tasks at the SUBJECT PREMISES, HALIM had them walk or drove them to a relative's homes, where the domestic employees would perform additional work for HALIM's family.  V1 and the other domestic employees slept on mattresses on the floor of the SUBJECT PREMISES's "study room," which doubled as the domestic employees' sleeping quarters at night. V1 indicated that s/he worked for HALIM and ANWAR everyday for

12

approximately two years, without a single day off.

h.    V1 indicated that HALIM maintained a notebook in which she recorded all expenses attributable to V1 and the other domestic employees.  On at least one occasion, V1 saw HALIM remove the notebook from a locked closet in HALIM's bedroom.  V1 also recalled overhearing a conversation in which HALIM indicated that she was going to retrieve another domestic employee's passport from the same locked closet.  A short time later, V1 saw HALIM with the passport.

i.    HALIM instructed V1 not to speak with anyone outside of the SUBJECT PREMISES, with the exception of V1's family in Indonesia.  Whenever V1 accompanied HALIM on shopping trips, HALIM would instruct V1 not to speak with strangers or the police.

j.    According to V1, in exchange for V1's work, HALIM sent money to V1's family in Indonesia every five to six months.

k.    In late 2012, V1 told HALIM that s/he wanted to return to Indonesia.  According to V1, HALIM told V1 that s/he could not return because s/he was still under contract.

l.    On or about December 31, 2012, V1 left the SUBJECT PREMISES while HALIM and ANWAR were away.  V1 contacted A.A., who was the only person V1 knew in the United States.

13

A.A. provided V1 with the address of a woman, N.M., whom A.A. believed could help V1. Although V1 had never met N.M., V1 took a taxi to N.M.'s home. V1 brought only a suitcase and a garbage bag of belongings with him/her. At the time, V1 did not have his/her passport or any form of identification on him/her. N.M. allowed V1 to stay at her residence.

10. Shortly after V1 left the SUBJECT PREMISES, people who claimed to be associated with, or acting on behalf of, HALIM began to contact V1, N.M. and V1's family.

a. According to N.M., between on or about February 19, 2013 and on or about February 26, 2013, N.M. received numerous text messages from telephone number (213) 254-8452 concerning V1. Toll records indicate that the subscriber for telephone number (213) 254-8452 is Haji Challyandra ("Challyandra's telephone"). Department of State databases reflect that Challyandra is an Indonesian national who is employed as a clerk at the Indonesian Consulate in Los Angeles. On or about February 21, 2013, N.M. received a text from Challyandra's telephone asking "where [V1] is" and to "please ask [V1] if [s/he] took [his or her] passport." On or about February 25, 2013, N.M. received a text from Challyandra's telephone indicating that he was "coordinating with [HALIM'S]

14

family" and that V1 "has [] worked for [HALIM] for two years."
The sender then asked whether it was "true that you are
accommodating [V1]." The following day, N.M. received a text
from Challyandra's telephone asking "why do you have to
accommodate [V1] in your house when in fact you know that [V1]
was working for [HALIM] for 2 years?"

b. On or about February 21, 2013, at the direction
of FBI Agents, V1 placed a consensually recorded and monitored
telephone call to HALIM to inquire about his/her passport.
During the conversation, HALIM stated she kept V1's passport in
her "cupboard" but that it was no longer in her possession.
HALIM invited V1 to her residence to "look for the passport
together" and stated the "cupboard" was unlocked when HALIM
returned home. HALIM indicated that she was not "a wicked
person" and that she would help V1. HALIM questioned "if [V1]
could run away from [her], who else could believe," [sic] and
stated that "none of [the other maids] ran away." V1 noted that
s/he asked HALIM to go home and was told that s/he could not
leave. HALIM responded that there was a "contract" and in the
past all the contracts were for "five years."

c. On or about March 4, 2013, N.M. received a text
message from an Indonesian telephone number. The author of the

15

message indicated that s/he had obtained V1's visa; the U.S. Embassy had contacted him/her for the past year in order to ascertain where V1 was located; and s/he had informed U.S. Embassy officials that s/he did not know where V1 was located. The author of the message also noted that one week prior to sending the text message to N.M., s/he had been re-contacted by U.S. Embassy officials regarding where V1 was located. The author noted U.S. Embassy officials informed him/her that s/he "would be cleared of the matter" if s/he provided V1's location. The author of the text message indicated that s/he provided U.S. Embassy officials with N.M.'s name and address.

d. On or about March 20, 2013, at the direction of FBI Agents, V1 placed a consensually recorded and monitored telephone call to HALIM to inquire about his/her passport. When V1 asked HALIM to return his/her passport, HALIM stated that she "handed everything over to the Embassy." HALIM instructed V1 to contact Challyandra at the Indonesian Consulate. HALIM also made multiple references to the employment contract V1 signed while in Indonesia.

e. On or about March 28, 2013, at the direction of FBI Agents, V1 placed a consensually recorded and monitored telephone call to HALIM to inquire about his/her passport.

16

During the conversation, HALIM stated as soon as V1 left her house, V1 was "no more my responsibility." HALIM instructed V1 to seek assistance from the man "who applied for your passport in the past." HALIM informed V1 that s/he should speak with Challyandra because V1 was no longer her "business."

      f.   On or about April 16, 2013, at the direction of FBI Agents, V1 called Challyandra to inquire about his/her passport. The call was consensually recorded and monitored. Challyandra told V1 that he only had a photocopy of V1's passport, but not the original. Challyandra indicated that he would help V1 obtain a new passport and he would pay V1's passport fees. Challyandra instructed V1 to obtain a letter from N.M. indicating that V1 was staying with N.M and that V1 should "use [N.M.'s] address for everything." Challyandra stated that V1 would need to file a police report indicating that s/he had lost his/her passport. Challyandra instructed V1 to falsely tell the police that V1 "dropped" the passport and that s/he "[did]n't know where," but "do not mention, mention [his] name, do not mention anyone else. Just say [the passport] fell while you were walking . . . wherever . . . that is easy." According to Challyandra, there was "no need to make it difficult," and that if V1 did not produce a letter from N.M.,

the passport "will not be taken care of."

       g.   According to V1's sister, in or around April, 2013, two men named "Suryo" and "Eko" went to V1's family's home in Indonesia. Suryo indicated he had been sent by ANWAR and had obtained the family's residential address from ANWAR. According to V1's sister, Suryo noted he could help facilitate V1's return trip to Indonesia. Suryo explained that it was dangerous for V1 to be in the United States without proper documentation, and asked that his contact information be relayed to V1.

       h.   On or about June 5, 2013, at the direction of FBI Agents, V1 placed a consensually recorded and monitored call to the telephone number that Suryo had previously provided to V1's sister ("Suryo's telephone number") in order to inquire about V1's travel back to Indonesia. During the conversation, Suryo stated he obtained V1's Indonesian address from ANWAR. Suryo asserted his belief that ANWAR had possession of V1's passport. Suryo offered to facilitate V1's return to Indonesia by obtaining all the necessary documents. Suryo noted he would communicate with ANWAR regarding V1's return trip to Indonesia.

       i.   On or about June 10, 2013, at the direction of FBI Agents, V1 placed a consensually recorded and monitored call to Suryo's telephone number. Suryo told V1 that ANWAR asked

18

Suryo to contact the police regarding V1 and that "maybe ... the problem was that you ran away from Mr. Hendra." Suryo noted that ANWAR would pay for V1 to return to Indonesia, and that ANWAR would pay for V1's return ticket to the United States if V1 wanted to work in the United States again.

11.  For the time period beginning on or about March 13, 2013 and ending on or about April 6, 2013, there were approximately 36 communications between telephone number (323) 447-8666 and Challyandra's telephone.  Toll records indicate that HALIM is the subscriber for telephone number (323) 447-8666.

12.  For the time period beginning on or about January 14, 2013 and ending on or about April 24, 2013, there were approximately 199 communications between Challyandra's telephone and telephone number (323) 369-2268.  Toll records indicate that HALIM is the subscriber for telephone number (323) 369-2268.

13.  On or about September 9, 2013, an employee of the United States Postal Service confirmed that HALIM and ANWAR received mail at the SUBJECT PREMISES.

14.  Through interviews of V1, my review of materials obtained from various government databases, my consultation with other FBI agents and Department of Homeland Security

Investigation officials, I have learned that:

  a. Immigration records indicate that V1 obtained a B-1 visa from the United States Embassy in Jakarta, Indonesia.

  b. A B-1 visa is a non-immigrant visa that allows foreign nationals to enter the U.S. temporarily for business. B-1 visa holders may stay in the U.S. until the stated date on their I-94 form (typically 6 months) or longer with exceptions. A B-1 visa does not permit the visa-holder to procure employment while the visa-holder is in the United States.

  c. V1's Non-Immigrant Visa (NIV) Application Form states that V1 would reside at a hotel while in the United States. The wife of HALIM's nephew is listed as the person who prepared V1's application and HALIM's nephew is listed as the person who paid for V1's trip.

  d. An internal State Department memorandum regarding the application includes notes from the visa interview stating, inter alia, that V1 was a "nanny" who was to "vacation with family for three weeks" and that "Nanny has been working for couple for 5 yrs."[1]

  e. Immigration records indicate that V1 arrived in the U.S on or about January 10, 2011 and that V1's B-1 visa

---

[1] The memorandum also contains a notation that "Nanny has worked for employer 6 yrs."

20

expired on April 10, 2011.

   f. According to CBP, prior to May, 2013, when a foreign national visited the United States, part of a form I-94 was stapled to the visiting alien's passport.  The portion of the form I-94 that was stapled to the visiting alien's passport reflected, among other things, the date until which the visitor was permitted to remain in the United States.

  15. Through interviews of V1, my review of materials obtained from various government databases, my consultation with other FBI agents and Department of Homeland Security Investigation officials, I have been informed that:

   a. In 2005, Victim 2 ("V2"), a female domestic employee, listed ANWAR as her sponsor for a B-1 visa application.  Her visa was issued on or about March 23, 2005 and expired on or about March 22, 2006.  V2 entered the United States on or about March 28, 2005.  V1 indicated V2 was a caretaker for HALIM's father for six years.  V1 indicated that V2 left the United States on January 31, 2012.  According to information contained in the Arrival Departure Information System, V2, who was listed as a male, departed from Los Angeles on February 1, 2012.

b.   In 2006, Victim 3 ("V3"), a female domestic employee, listed ANWAR as her sponsor for a B-1 visa.  Her visa was issued on April 11, 2006 and expired on April 6, 2007.  V3 entered the United States on June 1, 2006.  V1 indicated V3 worked for HALIM for 4 ½ years and cared for HALIM's father for six months.  V3 left the United States in 2011.

c.   In 2010, Victim 4 ("V4") applied for a B-1/B-2 visa.  On or about December 19, 2010, V4 entered the United States utilizing a B-1 visa.  V4's B-1 visa expired on June 18, 2011.  On or about April 16, 2013, FBI Agents observed ANWAR transporting V4 and an unknown female domestic employee ("UF") to HALIM's father's house.  After ANWAR dropped off V4 and UF, FBI Agents approached V4, who appeared to be working at the property.  Using a ruse, agents attempted to speak to V4.  V4, through a translator, indicated his/her name was the same as that of V1.  In addition, V4 indicated s/he could not speak at the moment because his/her boss would be back momentarily.  V1 thereafter reviewed video from that surveillance and confirmed that the domestic employee depicted in the video was V4.

## CONCLUSION

Based on the facts contained in this affidavit, there is probable cause to believe that ASTATI HALIM and HENDRA ANWAR have violated Title 8, United States Code, Section 1324 (a)(1)(A)(iii).

Additionally, there is probable cause to believe that evidence of violations Title 8, United States Code, Section 1324 (Alien Harboring), and Title 18, United States Code, Sections 371 (Conspiracy) and 1546 (Visa Fraud) will be found within the SUBJECT PREMISES.

DAVID LAM
Special Agent, FBI


Sworn and subscribed to
before me this ___ day
of ____, 2013

Honorable Patrick J. Walsh
United States Magistrate Judge

23